# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| ROBERTA OTIS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | NO. 3:15-cv-01512 |
| ) | CHIEF JUDGE CRENSHAW |
| METROPOLITAN GOVERNMENT OF ) | |
| NASHVILLE & DAVIDSON COUNTY, ) | |
| TN, et al., ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION

This case arises from Roberta Otis' employment with the Metropolitan Government of Nashville and Davidson County, Tennessee, and the Metropolitan Board of Public Education (collectively, "Metro"). (Doc. No. 1.) She raises claims based on her age, disability, and failure to pay overtime. (Id.) Before the Court is Metro's Motion for Summary Judgment, (Doc. No. 34) and Motion to Strike Otis' Declaration (Doc. No. 44). For the following reasons, Metro's Motion to Strike (Doc. No. 44) is granted in part and denied in part, and the Motion for Summary Judgment is granted in part and denied in part.

I. MOTION TO STRIKE

Otis submits her Declaration (Doc. No. 40-1) in opposition to Metro's Motion for Summary Judgment. Metro moves to strike the Declaration because it contradicts her deposition testimony. (Doc. No. 45.) Otis did not respond to Metro's Motion.

Metro specifically argues that the "vast majority" of paragraphs 3, 4, 5, and 10 of Otis' Declaration contradict her deposition testimony. (Doc. No. 45 at 3.) Those paragraphs relate to Sharon Pirtle's alleged comments about Otis' age and health. (Doc. No. 40-1 at 1-4.) Pirtle was

the principal at the school to which Otis was assigned. (Doc. No. 41 at 24.) The Declaration states that Pirtle called Otis "'sickly' numerous times throughout the school year." (Doc. No. 40-1 at 2.) It also states that Pirtle asked Otis in August 2013, "and on several other occasions thereafter" about how old she is. (Doc. No. 40-1 at 2.) Otis explains that any contradiction with her deposition testimony was caused by her confusion about whether the deposition questions related to the documents in front of her or her memory. (Doc. No. 40-1 at 3-4.)

At her deposition, Otis described two specific instances of harassment by Pirtle. (Doc. No. 34-1.) Otis testified that on August 23, 2013, Pirtle asked Otis how old she was. (Doc. No. 34-1 at 17.) On April 22, 2014, Pirtle called her "sickly." (Doc. No. 34-1 at 16.) She was then asked if those were the only two instances "of those types of statements" that Otis could provide, and Otis testified that there "may be one other." (Doc. No. 44-1 at 3.) She then testified that on August 9, 2013, Pirtle told Otis to get out of her face because she made Pirtle sick. (Doc. No. 44-1 at 4.) Otis testified that this was from her memory and not from her notes. (Doc. No. 44-1 at 3.) Otis also testified that there was "day-to-day intimidation, bullying, [and] hostile work environment." (Doc. No. 34-1 at 14.) She continued that Pirtle threatened her job. (Doc. No. 34-1 at 14.) At the conclusion of the deposition, Otis testified that she left nothing out from her answers. (Doc. No. 44-1 at 7.)

Generally, a plaintiff may not file an affidavit (or declaration) that directly contradicts his or her own prior deposition testimony. France v. Lucas, 836 F.3d 612, 622-23 (6th Cir. 2016) (citing Jones v. Gen. Motors Corp., 939 F.2d 380, 385 (6th Cir. 1991)). In determining whether a post-deposition affidavit is a "sham affidavit," the court must first determine whether the affidavit "directly contradicts the nonmoving party's prior sworn testimony." Aerel, S.R.L. v. PCC Airfolis, L.L.C., 448 F.3d 899, 908 (6th Cir. 2006) (citing Albertson v. T.J. Stevenson & Co., Inc., 749 F.2d

223, 228 (5th Cir. 1984)). A statement in an affidavit that directly contradicts the deposition testimony "should be stricken unless the party opposing summary judgment provides a persuasive justification for the contradiction." Id. (citing Miller v. A.H. Robins, Co., 766 F.2d 1102, 1104 (7th Cir. 1985)). If the statement in the affidavit does not directly contradict the deposition testimony, the court "should not strike or disregard that affidavit unless the court determines that the affidavit 'constitutes an attempt to create a sham fact issue.'" Id. (citing Franks v. Nimmo, 796 F.2d 1230, 1237 (10th Cir. 1986)). Whether the affidavit attempts to create a "sham fact issue turns on 'whether the affiant was cross-examined during [her] earlier testimony, whether the affiant had access to the pertinent evidence at the time of [her] earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion [that] the affidavit attempts to explain.'" Id. (quoting Franks, 796 F.2d at 1237).

Here, Otis' testimony in paragraphs four and five of her Declaration that Pirtle called Otis sickly "numerous times throughout the school year" and that Pirtle asked Otis how old she was "on several occasions" will be stricken. It directly contradicts Otis' deposition testimony that there were only three times Pirtle made "those kinds of statements" to her. Otis' explanation in paragraph ten that she was confused in her deposition is not a "persuasive justification" for the discrepancy in light of her testifying at the deposition that her testimony was from her memory and Metro's attorney told her not to refer to her notes. Therefore, references in paragraphs four and five of Otis' Declaration regarding Pirtle making numerous comments regarding Otis' age and disability are stricken.[1] The reference in paragraph three, that Pirtle made "several comments" to Otis "reflecting animus towards [her] based on [her] age and health" will not be stricken as it is consistent with the deposition testimony. (Doc. No. 40-1 at 1.)

---

[1] The remainder of paragraphs four and five are not stricken because they are consistent with Otis' deposition testimony.

## II. UNDISPUTED FACTS

Otis began working for Metro in 1985. (Doc. No. 41 at 10.) For one year she worked in the Metro Police Department, and thereafter for Metropolitan Nashville Public Schools ("Metro Schools"). (Doc. No. 41 at 10; Doc. No. 34-1 at 9.) Otis would be "unassigned" from a school at the end of the school year, and then be placed either at the same school or a different school the following school year. (Doc. No. 41 at 10; Doc. No. 34-1 at 11-12.) Beginning in 2009, Otis was assigned to Bellshire Design Center ("Bellshire"), an elementary school. (Doc. No. 41 at 10.)

Pippa Meriwether served as the Executive Lead Principal for Metro Schools from 2010 until the spring of 2017. (Doc. No. 41 at 22.) As Executive Lead Principal, Meriwether assisted, mentored, and supervised Lead Principals and some Principals at schools to which she was assigned. (Doc. No. 41 at 22.) Meriwether assisted Principals with staff development, staffing plans, and budgeting, among other duties. (Doc. No. 41 at 22.) For the 2012-13 school year, Christopher Marczak, PhD., served as one of Meriwether's Lead Principals and Bellshire's Principal. (Doc. No. 41 at 23.)

Bellshire had poor student academic achievement in 2013, with only 29.5% of them performing as proficient or advanced for their grade levels. (Doc. No. 41 at 15; Doc. No. 34-3 at 2.) In the spring of 2013, Metro Schools decided to focus more of Bellshire's resources on student instruction, tutoring, and academic observation and assessment by more qualified staff rather than funding two General Assistants. (Doc. No. 41 at 15.) As such, Marczak developed an "innovative staffing and instructional plan" that he intended to implement for the 2013-14 school year. (Doc. No. 41 at 23.) In order to implement this staffing plan, Marczak eliminated one of the two General

Assistant positions at Bellshire in June 2013, the position that Otis held, and Metro Schools placed Otis on the "unassigned" staff list. (Doc. No. 41 at 23.)

   *1. The Harassment*

In the summer of 2013, Marczak left Metro Schools to become an Assistant Superintendent at Oak Ridge Schools. (Doc. No. 41 at 24.) Meriwether became Bellshire's Lead Principal, and Metro Schools hired Shantrell Pirtle to become the Principal. (Doc. No. 41 at 24.) Meriwether decided to return the school to the "traditional school staffing model" for the 2013-14 school year because she was familiar with that model. (Doc. No. 41 at 24.) That also gave Pirtle time to acclimate to her new position and assess the educational needs of the students prior to implementing her own staffing plan. (Doc. No. 41 at 24.) As such, Meriwether restored the second General Assistant position at Bellshire and reassigned Otis to that position. (Doc. No. 41 at 25.)

During the 2013-14 school year, Otis claims Pirtle started "harassing, intimidating, bullying and creating a hostile work environment for" Otis. (Doc. No. 41 at 10.) Otis had to take time off work for respiratory problems, and when she returned from work, Pirtle told Otis that she is "sickly" and that Bellshire needs "someone that is not sickly." (Doc. No. 40-1 at 1-2.) In August 2013, Pirtle asked Otis how old she is and remarked, "I can't tell how old you are." (Doc. No. 40-1 at 2.) Pirtle told Otis multiple times that she would fire her. (Doc. No. 40-1 at 2.) In August 2013, Pirtle told Otis that she "would be gone from Bellshire prior to Christmas, 2013." (Doc. No. 40-1 at 2.) In May 2014, Pirtle attempted to fire Otis, but Meriwether determined that Pirtle's reasons, which are not in the record, were not acceptable and that Otis would not be fired. (Doc. No. 40-1 at 3.)

Pirtle also attempted to exasperate Otis' respiratory problems. Otis complained to Pirtle that the excessive heat in Otis' office made it difficult to breathe. (Doc. No. 40-1 at 3.) However,

5

Pirtle did not adjust the heat, leaving the temperature set over 80 degrees. (Doc. No. 40-1 at 3.) Pirtle complained to a Metro Schools official, who explained to Pirtle that Metro Schools had a policy to set the thermostat at 72 degrees. (Doc. No. 40-1 at 3.) However, after the meeting, Pirtle told Otis that Pirtle would not adjust the temperature to 72 degrees, and she instructed Otis not to touch the thermostat. (Doc. No. 40-1 at 3.) Otis never made a written request for accommodation because of her respiratory problems—only the verbal complaint to a Metro Schools official. (Doc. No. 41 at 12.)

  2. *Overtime Pay*

Aprile Futrelle was the secretary and bookkeeper at Bellshire from October 22, 2013, until the end of the 2014 school year. (Doc. No. 41 at 31.) Support staff employees would report to Futrelle if they worked more hours than 7.5 hours per day or 37.5 hours per week. (Doc. No. 41 at 31.) Otis admits that she never reported or claimed that she had worked more than forty hours in any work week. (Doc. No. 41 at 32.) Pirtle approved pay for Otis for all time she reported she had worked over her standard hours. (Doc. No. 41 at 31.)

  3. *The Elimination of Otis' Position*

In 2014, the percentage of Bellshire students that were proficient or advanced for their grade levels fell to 25.5%. (Doc. No. 34-3 at 3.) Meriwether and Pirtle believed it was necessary "for the good of the students" for Metro Schools to "reallocate resources towards student instruction, tutoring, academic observation and assessment by staff that possessed the appropriate level of education and credentials to perform those tasks." (Doc. No. 34-3 at 3.) The State of Tennessee also mandated that schools begin to implement Response to Intervention ("RTI") to improve the proficiency and reading level of students. (Doc. No. 34-3 at 4.) As such, Metro Schools again decided to eliminate one of the General Assistant positions at Bellshire and replace

it with an Education Assistant position. (Doc. No. 41 at 19; Doc. No. 34-3 at 4.) Meriwether and Pirtle testified that Metro Schools chose to terminate Otis' position instead of Geraldine Hill's because Hill, who at the time was approximately 60 years old, had worked for Metro Schools since 1985, and completed the payroll and medication distribution training, while Otis, who at the time was approximately 59 years old, did not complete the training.[2] (Doc. No. 41 at 9, 26.) Overall, Metro Schools "unassigned" five employees who held General Assistant positions after the 2013-14 school year. (Doc. No. 41 at 13.)

On June 18, 2014, Metro Schools' Executive Director of Human Resource Operations Craig Ott sent Otis a letter that Metro Schools eliminated her position for the 2014-15 school year. (Doc. No. 34-4 at 6.) The letter explained that the school "has decided to invest in programs that better align with the instructional needs of students." (Doc. No. 34-4 at 6.) Ott encouraged her to apply for other positions within Metro Schools, and invited her to contact Amber Tyus, a Human Resources Partner. (Doc. No. 34-4 at 6; Doc. No. 41 at 1.)

The Executive Director of Talent Strategy for Metro Schools Katie Cour published the 2013-14 Support Staff Overview, which explains how Metro Schools worked with "unassigned" support staff to find them positions. (Doc. No. 41 at 13; Doc. No. 34-6 at 5.) In the Overview, Metro Schools stated that "[b]udget flexibility did not result in more unassignments this year." (Doc. No. 34-6 at 5.) Of the seventy-nine support staff that were "unassigned" after the 2013-14 school year, thirty-nine had secured placements at the time the Overview was drafted. (Doc. No. 34-6 at 5.) The average number of support staff "unassigned" per year is around seventy-five.

---

[2] Otis attempts to dispute this fact, stating in her response to the Statement of Material Facts that she was scheduled to attend, "but was not permitted to attend due to the number of participants enrolled in the training classes . . . through no fault of Plaintiff." (Doc. No. 41 at 10.) She cites her own deposition, but does not include a page number. (Id.) The Court has reviewed the portion of her deposition in the summary judgment record and at no point does she state what she purports to state in this response. (Doc. No. 34-1.) As such, the Court deems this fact undisputed. M.D. Tenn. L.R. 56.01(c).

(Doc. No. 34-6 at 5.) Metro Schools says that it will "directly communicat[e] with all unassigned support staff about vacancies and opportunities" within the district. (Doc. No. 34-6 at 5.)

On July 17, 2014, Otis retired from Metro Schools, claiming an effective date of retirement of May 31, 2014. (Doc. No. 41 at 2; Doc. No. 34-8 at 3.) On October 13, 2014, Otis' union representative William Currie emailed Tyus, asking if she had "any positions available for Ms. Otis" because her job at Bellshire was eliminated last year. (Doc. No. 41 at 2; Doc. No. 34-8 at 5.) On October 14, 2014, Tyus responded to Currie's email, encouraging Otis to "look at the website and apply for any position that she may [be] interested in and qualified to fill." (Doc. No. 41 at 2; Doc. No. 34-8 at 4.) If Otis identified an open position, she could contact Tyus "to express her interest; preferably in writing." (Doc. No. 41 at 3; Doc. No. 34-8 at 4.) Otis never communicated with Tyus about her interest in any position with Metro Schools. (Doc. No. 41 at 3.)

*4. Replacing Otis*

Metro Schools hired Makieda Matthews, a "younger employee," as an Education Assistant to replace Otis. (Doc. No. 41 at 3.) Matthews had earned a Bachelor's of Science degree from Tennessee State University's College of Education and was working toward her Master's degree. (Doc. No. 41 at 22.) For six weeks during the school year, Matthews administered Aimsweb testing, the testing Bellshire used to determine each student's level of reading proficiency. (Doc. No. 41 at 4.) She would then enter the Aimsweb data into the computer system to use as a benchmark for reading proficiency. (Doc. No. 41 at 4-5.) Matthews also used the Iready reading intervention program for one hour per day for each grade level, Kindergarten through fourth grade, to help the students with their reading skills. (Doc. No. 41 at 5-6.) Matthews assessed and evaluated her students' progress throughout each week and registered their progress data. (Doc. No. 41 at 6.) Otis claims Metro Schools hired Matthews to do Otis' "exact job." (Doc. No. 41 at 11.)

5. *Metro's ADA Accommodation Policy*

During the 2013-14 school year, Metro had an ADA Compliance Policy (the "ADA Policy"). (Doc. No. 41 at 11; Doc. No. 34-5 at 3.) Metro required requests for accommodation to "be made in writing to the ADA department/school coordinator." (Doc. No. 34-5 at 5.) The school coordinator would sign the request for accommodation and send it to the Metro Schools ADA Coordinator, Henry Flenory. (Doc. No. 41 at 11; Doc. No. 34-5 at 5.) Within fifteen days of receiving the request, Flenory would respond to the individual requesting accommodation. (Doc. No. 34-5 at 5.) If Flenory's response was unsatisfactory to the employee, the employee could file a grievance with the Director of School Planning and Construction. (Doc. No. 34-5 at 5.) Otis never made a request under Metro's ADA Accommodation Policy. (Doc. No. 41 at 12.)

III. STANDARD OF REVIEW

As summarized by the Sixth Circuit:

> Summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). In considering such a motion, the court construes all reasonable factual inferences in favor of the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986).

Sommer v. Davis, 317 F.3d 686, 690 (6th Cir. 2003).

IV. ANALYSIS

Otis alleges: (1) disability discrimination, failure to accommodate, and retaliation in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112; (2) age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq.; (3) failure to pay overtime in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq.; and (4) violations of Tennessee law, including Tennessee common law and

the Tennessee Handicapped Discrimination Act. (Doc. No. 1.)[3] Metro does not address the state law claims in its Memorandum in Support of its Motion for Summary Judgment (Doc. No. 36), so the Court denies summary judgment on those claims.

A. ADA DISCRIMINATION

Metro argues that Otis cannot prove a prima facie case of disability discrimination, and even if she could, she cannot prove that Metro's legitimate nondiscriminatory reason for firing her was pretextual. (Doc. No. 36 at 14-17.) Otis argues that Pirtle's comment that Otis was "sickly" is direct evidence of discrimination. (Doc. No. 40 at 8.)

To prove disability discrimination using direct evidence, a plaintiff must prove that the employer took the adverse employment action "because of" the plaintiff's disability. Lewis v. Humboldt Acquisition Corp., Inc., 681 F.3d 312, 321 (6th Cir. 2012) (en banc) (citing Gross v. FBL Fin. Servs., Inc., 57 U.S. 167, 176 (2009)). "[I]f the fact-finder accepts the employee's version of the facts, no inference is necessary to conclude that the employee has proven this form of discrimination." Kleiber v. Honda of Am. Mfg., Inc., 485 F.3d 862, 868 (6th Cir. 2007). Here, Pirtle's comments that Otis looks "sickly" and that Otis makes Pirtle sick are not direct evidence that Metro terminated Otis because of her disability. Each requires an inference that the

---

[3] The Complaint also refers to a violation of "Title I of the Civil Rights Act of 1991." (Doc. No. 1 at 1.) There is no Title I of the Civil Rights Act of 1991. Instead, the Civil Rights Act of 1991 amended multiple discrimination statutes. Civil Rights Act of 1991, 105 Stat. 1071 (Nov. 21, 1991). To the extent that she is arguing a hostile work environment claim under Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended by the Civil Rights Act of 1991, the claim fails because there is no allegation, in the Complaint or in the Statement of Undisputed Facts, that Pirtle harassed Otis based on her sex. Williams v. Gen. Motors Corp., 187 F.3d 553, 565 (6th Cir. 1999).
   Additionally, Metro moves for summary judgment on Otis' ADA and ADEA harassment claims, to the extent she brings them. (Doc. No. 36 at 22-24.) Those claims are not in the Complaint, and therefore Otis did not properly bring either claim. FED. R. CIV. P. 8(a). To the extent Otis does bring them, the evidence in the record suggests that Otis may have been subjected to harassment, but not harassment due to age or disability. Instead, there are only three comments over the course of a year regarding Otis' age and disability. (Doc. No. 40-1 at 2-3.) This is not "sufficiently severe or pervasive to alter the conditions of the victim's employment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993). Accordingly, to the extent these claims are brought, Metro would be entitled to summary judgment.

10

decisionmaker had an invidious motive based on Otis' disability and to end her employment. Accordingly, Otis must prove her disability discrimination claim using indirect evidence.

The burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), is used to analyze disability discrimination claims based on indirect evidence. Ferrari v. Ford Motor Co., 826 F.3d 885, 891 (6th Cir. 2016) (citing Monette v. Elec. Data Sys. Corp., 90 F.3d 1173, 1179-82 (6th Cir. 1996)). To prove a prima facie case of disability discrimination, the plaintiff must show that (1) "he or she is disabled, (2) he or she is otherwise qualified for the position, with or without reasonable accommodation, (3) he or she suffered an adverse employment decision, (4) the employer knew or had reason to know of the plaintiff's disability, and (5) the position remained open while the employer sought other applicants or the disabled individual was replaced." Id. at 891-92 (citing Monette, 90 F.3d at 1186).

*1. Otherwise Qualified*

Metro argues that Otis was no longer "otherwise qualified" for her previous position of General Assistant because she did not complete the payroll or medication distribution training. (Doc. No. 36 at 14.) An employee is "otherwise qualified" if she, "with or without a reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." Rorrer v. City of Stow, 743 F.3d 1025, 1038 (6th Cir. 2014) (quoting 42 U.S.C. § 12111(8)).

Here, Otis had been working for Metro Schools since 1986, and Bellshire since 2009. Metro, which has the burden of production as the moving party on summary judgment, does not cite any facts in the record that the payroll or medication distribution trainings were essential job requirements, making Otis unqualified to perform the job of a General Assistant. See Clay v. United Parcel Serv., Inc., 501 F.3d 695, 714 (6th Cir. 2007) (holding that if the plaintiff provides

11

proof that meets her initial burden of production and the "defendant is silent in the face of plaintiff's evidence, then the case proceeds to trial to weigh the evidence"). Indeed, nowhere in the record is any explanation of the essential job requirements for the position. Accordingly, because Otis previously served as a General Assistant without the payroll or medication distribution training, there is a factual dispute on whether Otis was otherwise qualified.

   2. *Replaced*

Metro argues that Otis was not replaced, but instead her job was eliminated. (Doc. No. 36 at 14-15.) However, "[a]n employee is not eliminated as part of a work force reduction when he or she is replaced after his or her discharge." Barnes v. GenCorp., Inc., 896 F.2d 1457, 1465 (6th Cir. 1990). The determination of whether an employee's job was eliminated turns on whether another employee absorbed the terminated employee's duties in addition to other duties, or if another employee is hired or reassigned to perform the plaintiff's duties. Id. (citing Sahadi, 636 F.2d 1116, 1117 (6th Cir. 1980)).

Here, while the Court has serious questions about whether Matthews replaced Otis or if Otis' position was eliminated, the Court cannot make such a determination on the factual record presented. Metro includes facts about Matthews' and Hill's job duties, but it does not meet its burden of production to show it is entitled to summary judgment because the record is void of any job duties formerly performed by Otis, particularly in the classroom. See Hunter v. Caliber Sys., Inc., 220 F.3d 702, 725-26 (6th Cir. 2000) (holding that the party moving for summary judgment has "the initial burden of production and persuasion on the motion"). Instead, the only fact about Otis' involvement in the classroom is that she worked directly "with students in the classroom on instruction, tutoring and observation and assessment with regard to academic subjects for which the students needed additional assistance." (Doc. No. 40-1 at 1.) These duties appear consistent

12

with Matthews' duties of administering the Aimsweb testing and Iready intervention program. There is a disputed material fact as to whether Metro hired Matthews to do Otis' job or whether Matthews had other job duties that would preclude a finding that she replaced Otis.

   *3. Pretext*

Metro has proffered three legitimate, nondiscriminatory reasons for terminating Otis: (1) they eliminated her position in order to replace it with an Education Assistant; (2) Otis was not qualified for the Education Assistant position; and (3) Otis did not perform the payroll and medication distribution training, while Hill did. (Doc. No. 36 at 17 (referring to Doc. No. 36 at 13)). Therefore, the burden shifts to Otis to prove that the legitimate, nondiscriminatory reasons are pretext for disability discrimination. Ferrari, 826 F.3d 885, 894 (6th Cir. 2016) (citing Monette, 90 F.3d at 1186). Otis can prove pretext in "three interrelated ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." Id. at 895 (quoting Romans v. Mich. Dep't of Human Servs., 668 F.3d 826, 839 (6th Cir. 2012)).

Here, there is a genuine issue of disputed fact as to whether the proffered reasons actually motivated Metro's action. As described above, there is a question of fact regarding whether Matthews replaced Otis. While Otis admits she is not qualified for the Education Assistant position, there is no evidence as to why she could not perform the same duties Matthews performed as a General Assistant. Given Pirtle's (1) comments about Otis being "sickly" and making Pirtle "sick," (2) attempt to fire Otis earlier in the year, and (3) constant threatening to fire Otis, there is a genuine issue of material fact precluding summary judgment on whether the elimination of Otis' position was really pretext for disability discrimination. Summary judgment on the ADA discrimination claim is denied.

13

B. FAILURE TO ACCOMMODATE

Metro moves for summary judgment on Otis' failure to accommodate claim because (1) Otis did not follow the ADA Policy in requesting a reasonable accommodation, and (2) Pirtle accommodated Otis multiple times throughout the 2013-14 school year. (Doc. No. 36 at 21-22.) To prove a prima facie case of a failure to accommodate claim under the ADA, "a plaintiff must show that: (1) she is disabled within the meaning of the Act; (2) she is otherwise qualified for the position, with or without reasonable accommodation; (3) her employer knew or had reason to know about her disability; (4) she requested an accommodation; and (5) the employer failed to provide the necessary accommodation." Judge v. Landscape Forms, Inc., 592 Fed. Appx. 403, 407 (6th Cir. 2014).

Metro argues, without citation to legal authority, that Otis' claim for failure to accommodate should fail because she did not notify Flenory in writing that she needed the thermostat to be lowered for her asthma. (Doc. No. 36 at 20.) However, to request an accommodation, a plaintiff only needs to "make it clear from the context that [the request] is being made in order to conform with existing medical restrictions." Deister v. Auto Club Ins. Ass'n, 647 Fed. Appx. 652, 658 (6th Cir. 2016) (citing Judge v. Landscape Forms, Inc., 592 Fed. Appx. 403, 407 (6th Cir. 2014)). Once a plaintiff makes an accommodation request, it becomes a "known physical or mental illness" that the employer is required to reasonably accommodate. 29 C.F.R. § 1630.9(a). As such, the failure to follow Metro's policy does not, by itself, defeat a failure to accommodate claim.

Instead, the undisputed facts show that Otis complained to a Metro Schools official and Pirtle that the heat was too high, affecting her respiratory problems. Metro then knew or had reason to know about Otis' disability. The official told Pirtle to turn the heat down to 72. There is a dispute

14

as to whether Pirtle turned the heat down to 72 degrees. (Doc. No. 34-2 at 5; Doc. No. 40-1 at 3.) This disputed material fact precludes summary judgment.

C. ADA RETALIATION

Metro argues that Otis cannot prove her ADA retaliation claim because she cannot show that its legitimate, nonretaliatory reasons for eliminating her position were pretext for retaliation for requesting an accommodation for her disability. (Doc. No. 36 at 17-18.) The Court analyzes the retaliation claim under the familiar McDonnell Douglas burden-shifting framework. Rorrer v. City of Stow, 743 F.3d 1025, 1046 (6th Cir. 2014). To prove a prima facie case of retaliation, in violation of the ADA, a plaintiff must show that "(1) the plaintiff engaged in activity protected under the ADA; (2) the employer knew of that activity; (3) the employer took an adverse action against plaintiff; and (4) there was a causal connection between the protected activity and the adverse action." Id. (citing A.C. v. Shelby Cty. Bd. of Educ., 711 F.3d 687, 697 (6th Cir. 2013)). Metro concedes that Otis can make a prima facie showing of retaliation for the purposes of summary judgment.

The burden then shifts to Metro to proffer a legitimate, non-retaliatory reason for the adverse employment action. Gribcheck v. Runyon, 245 F.3d 547, 551 (6th Cir. 2001) (citing McDonnell Douglas, 411 U.S. at 802). Metro largely repeats the legitimate, nonretaliatory reasons described above in Section IV.A.3 of this Opinion. (Doc. No. 36 at 18-19.) For the same reasons as given in that section, a reasonable jury could find those reasons are pretextual, Gribcheck, 245 F.3d at 552 (citing Wrenn v. Gould, 808 F.2d 493, 501 (6th Cir. 1987)), and therefore summary judgment on the ADA retaliation claim is denied.

D.  ADEA DISCRIMINATION

Metro argues that Otis cannot establish a prima facie age discrimination claim because Otis was not otherwise qualified to be a General Assistant and Otis cannot establish causation. (Doc. No. 36 at 8-11.) Even if Otis can make a prima facie age discrimination claim, Metro argues that its legitimate, nondiscriminatory reason for eliminating her position is not pretext for age discrimination. (Doc. No. 36 at 11-12.)

To establish a prima facie case of age discrimination, a plaintiff must show "(1) membership in a protected group; (2) qualification for the job in question; (3) an adverse employment action; and (4) circumstances that support an inference of discrimination." Blizzard v. Marion Tech. College, 698 F.3d 275, 283 (6th Cir. 2012) (quoting Swierkiewicz v. Sorema N.A., 534 U.S. 506, 510 (2002)). Metro's arguments that Plaintiff is not qualified are the same as in its ADA claim, and there are disputed issues of material fact for the reasons stated above. (Doc. No. 36 at 8-9.) Additionally, as Matthews was significantly younger than Otis, there are circumstances that support an inference of discrimination. Grosjean v. First Energy Corp., 349 F.3d 332, 336 (6th Cir. 2003). As such, Metro is not entitled to summary judgment on Otis' prima facie age discrimination claim.

If Otis can establish a prima facie case of age discrimination, the burden shifts to Metro to proffer a legitimate, nondiscriminatory reason for eliminating Otis' position. Blizzard, 698 F.3d at 284. Metro proffers the same reasons as in the disability discrimination claim. (Doc. No. 36 at 11-12.) As explained above, in addition to Pirtle's comments about Otis' age, there are disputed issues of material fact as to whether those reasons are pretext for discrimination, and therefore summary judgment is denied.

E.  FLSA

Metro moves for summary judgment on Otis' FLSA claim, arguing that Otis has not proven that she claimed she worked more than forty hours in any work week. (Doc. No. 36 at 25.) Otis provides no evidence regarding her not getting paid for any time worked, nor does she respond to this argument on summary judgment. See M.D. Tenn. L.R. 7.01(b) (failure to respond to a motion indicates no opposition to that motion). "[A]n FLSA plaintiff must prove by a preponderance of the evidence that he or she performed work for which he or she was not properly compensated." White v. Baptist Memorial Health Care Corp., 699 F.3d 869, 873 (6th Cir. 2012) (quoting Myers v. Copper Cellar Corp., 192 F.3d 546, 551 (6th Cir. 1999)). Metro is entitled to summary judgment on the FLSA claim.

V.  REMAINING ISSUES

Otis designates a large portion of her brief discussing evidentiary issues with Metro's Statement of Undisputed Facts. (Doc. No. 40 at 1-5.) These objections were taken into account in the Section II of this Opinion, and when an objection was sustained, the fact is not included in the Opinion.[4] The Court does not need to discuss the remaining objections because it denies summary judgment on all claims except the FLSA claim, and none of the facts to which Otis objected are relevant to the FLSA claim. As such, the remaining objections are moot.

---

[4] For example, on fact 31, the Court sustained Plaintiff's objection that Meriwether and Pirtle's Declarations did not support the proposition that General School Assistants were required to complete training for payroll and medication distribution. (Doc. No. 41 at 8.)

17

E.  FLSA

Metro moves for summary judgment on Otis' FLSA claim, arguing that Otis has not proven that she claimed she worked more than forty hours in any work week. (Doc. No. 36 at 25.) Otis provides no evidence regarding her not getting paid for any time worked, nor does she respond to this argument on summary judgment. See M.D. Tenn. L.R. 7.01(b) (failure to respond to a motion indicates no opposition to that motion). "[A]n FLSA plaintiff must prove by a preponderance of the evidence that he or she performed work for which he or she was not properly compensated." White v. Baptist Memorial Health Care Corp., 699 F.3d 869, 873 (6th Cir. 2012) (quoting Myers v. Copper Cellar Corp., 192 F.3d 546, 551 (6th Cir. 1999)). Metro is entitled to summary judgment on the FLSA claim.

V.  REMAINING ISSUES

Otis designates a large portion of her brief discussing evidentiary issues with Metro's Statement of Undisputed Facts. (Doc. No. 40 at 1-5.) These objections were taken into account in the Section II of this Opinion, and when an objection was sustained, the fact is not included in the Opinion.[4] The Court does not need to discuss the remaining objections because it denies summary judgment on all claims except the FLSA claim, and none of the facts to which Otis objected are relevant to the FLSA claim. As such, the remaining objections are moot.

---

[4] For example, on fact 31, the Court sustained Plaintiff's objection that Meriwether and Pirtle's Declarations did not support the proposition that General School Assistants were required to complete training for payroll and medication distribution. (Doc. No. 41 at 8.)

17

VI. CONCLUSION

For the foregoing reasons, Metro's Motion for summary judgment (Doc. No. 34) is **GRANTED IN PART and DENIED IN PART**, and Metro's Motion to Strike (Doc. No. 44) is **GRANTED**.

The Court will issue an appropriate Order.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE